20-6057 and 20-6100 Hetronic International v. Hetronic Germany GmbH Good morning, counsel. All right, I will turn to you then, Mr. Walker, and ask you to proceed when you're ready. Thank you. May it please the court. Lucas Walker for Abitron Austria and the are not extraterritorial and that they extend only to claims where the claimed infringing use in commerce is domestic. That has three major implications for how this case should now proceed. First, Hetronic International cannot recover defendants' profits from their foreign sales because those sales did not involve defendants' domestic use of marks in commerce, which is why Hetronic instead tries to reach those foreign sales under a completely different theory, based on something other than a domestic use of the mark in commerce. But that just wishes away the Supreme Court's decision, which held squarely that domestic use of the mark in commerce is necessary, and that's what provides the dividing line between a permissible domestic application and an impermissible extraterritorial application. As a result, any disgorgement must be limited to sales that arose from a domestic use of the mark in commerce, and here that means that only sales are the only use in commerce that can possibly be. There could be advertising or something like that, but the disgorgement remedy that Hetronic has sought here specifically looks to defendants' sales, and the only sales by the defendants that could be contributed to any kind of domestic use in commerce are sales to U.S. buyers. What about sales in Europe to a European company, who then distributes to the United States? Doesn't that fit use of the trademark in commerce? So the sale by that foreign buyer in the United States, that would be a domestic use of the mark in commerce, but it would be a domestic use by the reseller. It wouldn't be a domestic use by the defendants. Well, that's not the way I read what Justice Jackson said. Yeah, so Justice Jackson did propose, speaking only for herself on a question, no other justice addressed, did suggest that in that situation, if you have a foreign seller who sells to a foreign buyer in a foreign country, that if that foreign buyer ever sells it in the United States, that somehow becomes a domestic use by the foreign seller. And I think- Because apparently it would be accepted by the four dissenters in the majority opinion, and it was not disclaimed by any one of the other four in the majority. That suggests to me that that is the rule. Respectfully, I think that's not the way to read the different opinions in the, from the Supreme Court here. So five justices- Precisely correct me in why that is not the right way to read this opinion. Yes. So five justices, a majority of the court held that a domestic use in commerce is required. Justice Jackson joined that in full without reservation. Four justices disagreed. They thought that domestic likelihood of confusion was enough that a domestic use wasn't required. So that's a 5-4 split on the holding that a domestic use is required. Then there's the later question, which the majority and the concurrence by Justice Sotomayor never addressed, and that's what exactly could be considered a domestic use in commerce? That later question, that subsequent question, which is the question, I think, for this court to decide, is what counts exactly as a domestic use in commerce? And Justice Jackson expressed a view on that, but she was the only one who expressed any view on that. The other eight justices didn't say anything about it. And so it really is that, you know, her views merit consideration, but I think ultimately it's an incomplete view of what would be necessary to attribute someone else's use to foreign sellers. Why is that view of Justice Jackson not the one that would be necessarily applied by the dissenters when the next case comes before them and the precedent is abetron? So the precedent is that a domestic use in commerce is required. That is now the holding. That's the rule that has to be applied in this court, and if it were to go up to the Supreme Court again. And those four, call them the dissenters, but the concurrence and the judgment did not say anything about what they think would be a domestic use in commerce. To the extent they did, I think Justice Sotomayor suggested in footnote 7 that that situation might not be a domestic use in commerce, but it's just not something they addressed. They went entirely on the thinking that the likelihood of infusion in the United States was enough. And so it would be a fresh question for the court to decide what is enough for a domestic use in commerce. I think Justice Jackson's approach is a bit incomplete because the rule for when a use in commerce counts as a foreign entity's use in domestic commerce turns on whether that sale in the United States, a resale by some third party, is done on behalf of the foreign seller. Not just it was bought abroad and then someone resells in the United States, but that resale in the United States is done on behalf of the foreign seller. That's the rule that applies when you're trying to register a trademark, which also requires use in commerce. And a use in commerce has to have a consistent meaning throughout the entire statute. And so here there's no allegation that anyone ever resold on behalf of us after buying something outside of the United States. We had a distributor, but actually we sold them to the United States. That was the 16,000 euros worth of sales, direct U.S. sales. But there's just nothing that shows that that was on behalf of us or something else that would be the basis for attributing those later resales to us. Let me ask, I want to focus you on the state court claims. You didn't appeal the state court, the verdict related to the state court claims, and now you want to raise essentially a evidentiary 403 issue with respect to those claims. I don't know how you can do that when you never appealed. All along you've been arguing that there's no extraterritorial reach. And if you believed that, and if you were successful, you could have made exactly the argument you're making now about the impact of that evidence on the state law verdict in the district court and again on appeal to us, but you never did. How can you now make that argument? It is something we did not previously raise. I think the appeal brings the entire case before this court. I think it does have the power to reach that. How do we have the power to reach it when you never appealed it? We don't reach out and take issues that weren't raised on appeal. A notice of appeal does bring the entire case up to this court. In terms of jurisdiction, it does have power. I do admit we didn't raise it in the previous opening briefing. You'd have a waiver and a forfeiture issue. Yes. And I think what I would just say on this is all we're asking is, all we want to say is that given how dramatically this case has now changed, where 90 million or some large part of that 90 million Lanham Act award that was a huge part of this case has now gone away, realizing that it was impermissibly extraterritorial, it would be within the discretion of the district court to grant a new trial in that situation on the state law claims. And so we're just asking, all we're asking right now is for the court to remand for the district court to make that discretionary determination. I don't even know how we can do that. You didn't appeal it. It's done. Again, I think in terms of the court's jurisdiction, a notice of appeal brings the whole case up. But this is not our primary submission. And so certainly, it may be within the court's discretion to not address it for those reasons. But we do think since the case is going to have to go back down because the discouragement award has to be severely reduced and because the injunction needs to be redone, that it would make sense to allow the court to exercise its discretion whether to do that. And perhaps it would consider all of those considerations that you've raised yourself. But I think the primary thing that I want to focus on is just the discouragement award and the injunction to Lanham Act claims. That really is our primary focus here. Before we leave that, though, you're not saying that we would commit any error if we went as Judge McHugh suggests. I think it would probably be within the court's discretion not to do so. We just think that given how dramatically this has changed, the Supreme Court has changed the law, that that might be a situation to exercise the discretion to allow the district court to then exercise its discretion on this question. Well, and focusing again on what's here, to the extent that Hedtronic wants to argue other uses in commerce that are domestic, it would be limited to the record it's already created. Would you agree with that? I think so. Hedtronic has not asked to reopen the record for a new trial on anything like that. And they haven't pointed to anything that suggests that those numbers we've identified are wrong. I don't think they've made any argument that the number of the direct sales is incorrect, whether that number is the 16,000 we made to non-Hedtronic U.S. buyers or the 202,000 that we made to all U.S. buyers, including Hedtronic itself. I don't think there's any dispute that that's the right number of direct U.S. sales. And while we don't think those indirect sales, that 1.7 million euros of goods that were sold outside of the United States and may have later reached the United States, while we don't think that those are properly reached by the Lanham Act, if that category of sales were subject to it, Hedtronic hasn't provided any evidence that shows that that number should be any higher than it is. They pointed to some alleged additional sales by Tupin, but we showed that that testimony was talking about sales that go back all the way to 2003-2004, which is before Hedtronic International even existed. And so I don't think there's any factual dispute on this record that the proper amounts for those categories are either the 16,000 or the 202,000 for the direct U.S. sales, or the 1.7 million if you were to count those foreign sales of goods that later reached the United States. I want to inquire about the foreign sales that you indicated that are now not proper damages under the Lanham Act. Assume that this panel just does not accept your argument about the applicability of Justice Jackson's approach. Just assume that. How does this panel or the district court on remand analyze those foreign sales and determine which of those actually ended up in the United States bearing the infringing trademark? Because some of those foreign sales probably did end up in the United States. Is there anything in the record that would distinguish foreign sales that never reached this country and foreign sales that did reach this country? Yeah, so the absolute maximum of the foreign sales that could have reached this country is the 1.7 million euros that we identified that the court identified in its prior opinion in this case. That's actually over-inclusive because it includes any order that had a U.S. destination for any product. Wait a minute, what about these sales that ended up in cranes in this country that were never counted in the 1.7 euros? I don't think there's any evidence that anything wasn't counted within the 1.7 because that includes products that we sold to crane manufacturers or crane sellers who would have incorporated them into their products and then brought them to the United States. And I think one reason why we know that is because we had to make modifications. We had to make sure that they could be used on the right radio frequencies in the United States. So if we didn't have down that it was a U.S. destination, we wouldn't have been able to make those necessary modifications. And includes every device that had the infringing mark on it even though the defendant was not directly responsible for getting those goods into this country. Are you telling me that? I think that is what the record shows. There's no evidence that that doesn't include anything else. And the two, I would say the two pin products are the only ones otherwise points to and we responded to that supplemental reply. So unless there are further questions right now, I'd like to reserve the remainder of my time. Very well. Ms. Berman, proceed when you're ready. Morning, Your Honors. May it please the court. Debbie Berman on behalf of Appley Hedronic International, Inc. I'd like to start with responding to Judge Murphy's last question about whether there's anything in the record that would suggest additional sales beyond the 1.7 million euros were resold into the United States. And the answer is definitely yes. We identify much of that evidence in our response post remand. And as a defendant's own witnesses testified that it was not a requirement on the invoice to indicate if the radio remote control would be installed on a piece of equipment that would later be sold into the United States. While that happened, it was not required. And so their own witnesses testified and that evidence is on the record that that's an under inclusive number, not an over inclusive number. And not only what do we have that general testimony, but then we also gave specific examples in our response of the toy pin products coming to the United States. Also, their own distributor testified about another customer who's not in those 1.7 million euros of invoices who was seeking repair for their unit in the United States that they sent to Hedronic International. And then you heard from Hedronic's own witnesses of receiving radio remote controls in Oklahoma for radio remote So do you agree that that that would require not just a remand, but a new trial for you to put on evidence of what those amounts would be that you did not earlier put in, because you are operating under a theory of extraterritoriality that has been reversed. So, Your Honor, I do not believe that a retrial is necessary in this case. All of this evidence is in the record that Judge Friot heard during the three week trial. And if the way that this scorchment remedy works is it is our burden to put in front of Judge Friot the revenues for sales that are attributable to the domestic infringing conduct. And if I can just address that for one minute, we believe that under the Supreme Court's new authority, domestic infringing conduct, that many, many of the defendant's sales are going to be covered because the domestic infringing conduct that they committed in the United States permitted them to sell the radio remote controls to original equipment manufacturers in Europe who they knew were going to install them on products. And those original equipment manufacturers would not have bought the products from Abitron if those products could not be in the United States. And there is significant evidence already in the record on that issue. The defendant's own distributor testified that the whole reason that they were created was so that they could take a pair of toy pen and other products that they knew were coming to the United States. Mr. Fuchs, who's a defendant in this case. Let me interrupt you. I understand there may be evidence, but what you're missing is a finding by the fact finder in that regard. Now, that jury verdict is very extensive and I almost got dizzy looking at it. But can you tell from the jury verdict of what that additional number would be beyond the 1.7 euros from the jury verdict? I'm sorry, Your Honor. I didn't mean to speak over you. So, actually, the jury is not the finder of fact who decides escorgement. The Lanham Act is clear that that's for the judge to decide. At most, the jury gives a recommendation, but ultimately, it's Judge Fried who has to make that determination. And he heard all of that evidence. And the way that escorgement works, and it's worked in prior cases where the Tenth Circuit has sent down Lanham Act cases, including Your Honor's case that you've decided, to go back to the district court. And the district court, we have met our burden to show, and we'll reiterate it to Judge Fried, the quantum of sales that are attributable to domestic infringing conduct. And we all agree that that's what the standard is. That's what the defendants repeatedly say in their brief, and you heard Mr. Walker say it today. Then the burden then shifts to the defendants to say that, no, those sales were attributable to something other than the domestic infringing conduct. But all the dollar values for all the sales, who they were all sold to, all of that information is in the record. And it would be for Judge Fried to do post-jury in the first instance, like he did in this case, and he can now do it on remand. There's no need for a retrial. So, you're telling me that the evidence that was placed on products, that the defendant was not responsible directly for getting into the United States? Your Honor, I think... Can you identify those products? I believe we can identify a number of them. One other thing I'd like to point out is that the Lanham Act is clear, that if there's, if it's, if you can't determine from the defendant's records which products actually came to the United States because of their record keeping, they don't get the benefit of that doubt because that just rewards the infringer. And here we have a willful infringer. And so, the law is clear. And what Judge Fried will do is, we'll put in the evidence of the revenues. They'll say, these aren't attributable to that. And Judge Fried will then weigh to determine what is fair given the total circumstances in this case. That's what disgorgement is. It's not a, lost profits, where, okay, this is the profit number. Disgorgement is a determination of what is fair in this case. One, to deter future conduct. And here we have willful infringers who were not easily deterred. And two, to ensure that the defendants don't have unjust enrichment from their willful infringement. And again, if there's... Go ahead. Are you talking about 1117, right? Section 1117. All right. On this category, the second category of sales, products sold abroad that wound up in the United States, how dependent are you that we accept your view that the Supreme Court simply clarified and reaffirmed Steele? Which is to say, if we take Steele out of the mix, do you still have a claim for that category? Yes, Your Honor. We believe that Steele is an alternative basis to award damage, to award disgorgement in this case. You know, the Abitron decision did not hold that, you know, willful infringers who infringe using domestic, with a domestic infringement are not, cannot be held viable in the United States. But you don't need to reach Steele because you can look at the domestic infringing conduct in this case, where they were advertising, they had distributors, they were doing repairs. They send letters to US customers saying, we're now HATRONIC, you're not HATRONIC. And it was because the original equipment manufacturers knew that they could, that their products could be repaired and serviced in the United States, that they bought those products in Europe, even if they were not originally designated for the United States. These original equipment manufacturers don't buy one product for the United States, one product for Germany, one product for Austria. They buy because their products move all over the places. The evidence has shown in spades in this case. And so it's those domestic infringing uses that led to the sales to the OEMs. And those are properly disgorgeable for putting aside Steele and putting aside Justice Jackson's definition of domestic infringing conduct. Do you have to, of tying the disgorgement amount you're claiming to a domestic use in commerce? So for example, if you're saying the use in commerce is their advertising in the United States, do you then have an initial burden to tie the profits to that advertising? So your honor, the initial burden that we have is to show that there's a plausible connection between their domestic infringing conduct and their sales that they made that we believe are covered by the Lanham Act. That is the burden that is on the plaintiff in a Lanham Act case. The Supreme Court didn't change how remedies work in Lanham Act cases. That's how they work in cases. The burden then shifts to the defendants for them to come forward and argue that there was some other reason why those sales were made. Ours doesn't have to be the only reason or even the predominant reason, but as long as there's a plausible connection between the sales. And then Judge Friot will exercise his discretion to determine, okay, well, the defendant said sales may, and it's not a sale by sale basis. It's over the entire products that were sold in this area. And this is exactly what district court judges do all the time. When there's a advertisement in the United States that's shown to be infringing for product X, all of the revenues for product X are put into evidence by the plaintiff. And as long as they've shown, and then, but then it burden then shifts to the defendants to say, well, there's other reasons why we made those sales. We have a better product. We have a better price. That's what judges, district court judges do all the time in Lanham Act discouragement cases. And as I said earlier, the Supreme Court didn't change remedies. It only talked about what uses count for liability, but we have an admission by the defendants here that they're liable and that they're willful infringers. So this case on remand is only about remedies. And, and are you, and you're saying that all of that can be done on the existing record? Yes, Your Honor, we believe that it can be. Thank you. Counsel, did you ask for attorney's fees and travel damages in the original proceedings in district court? So Your Honor, we did all the way up through in our complaint and in all the pretrial filings, we did ask for attorney's fees and trouble damages actually is just an element of those. Was that denied? No, Your Honor. So given the amount of damages that were awarded, we elected not to ask judge Fry to trouble them or to award attorney's fees. But the law is clear now that that award is being vacated, that we can revisit our elections. What is there in the record that indicates that you gave up that claim because of the size of the verdict? Your Honor, it's our motion to enter a final judgment in this case where we indicated why we would not be seeking attorney's fees or trouble damages. And in that document, you say we're not going to pursue them because we got so much money and verdict. That's the gist of it. Yes, Your Honor. And even if we hadn't said that, given the fact that we elected to ask post jury, so the trial wouldn't have changed in any way. The thing that the courts look at is whether the defendants would have wanted to put in different evidence. We didn't make that election until after the jury verdict, until after Judge Fry entered the injunction when we moved for entry a final judgment in this case. So there was every incentive for the defendants to deal with those issues at that time. And because the verdict is now being vacated, we can revisit those elections. But I do want to point out that trouble damages is not a different type of damage. It is part of disgorgement considerations that district courts take into it. It's part of disgorging. You can disgorge up to three times the amount, as opposed to a separate where attorney's fees are separate. So is it your position that even if you don't ask for trouble damages, the district court has discretion to trouble them anyway? I don't know if Judge Fry presumably had the... What we did ask for them in all of the pleadings up to and through the trial. He could have had the discretion to do that. We indicated that we weren't seeking that as part of our disgorgement judgment in light of the size of the award. I don't think that answered my question. I'm sorry, Your Honor. I thought I did. Yeah. Okay. My question is where you specifically told the district court that you were electing not to ask for trouble damages. Could the district court have then troubled them anyway? I suppose that the court could because it's ultimately the court's discretion to determine if they want to trouble damages or not. But I don't think that it would be likely because we told Judge Fry we weren't interested in that part of the remedy. And I'm not aware in most cases where a judge is going to give you a larger judgment than you've requested. So whether it's maybe, but I don't think that it's likely because we told the judge we weren't interested in that at the time. Can you speak to Justice Jackson's concurrence and the effect? Because it is kind of confusing as far as how we plug that in with either of the bans of four. Yes, Your Honor. So I will address Justice Jackson's concurrence. I don't think it's necessary for Your Honor to go as far as Justice Jackson suggests because this is an entirely different case. In her hypothetical, there was really no relationship between the original seller and the reseller other than that person had bought the purse for their own personal use and then later decided to sell it. And there was no conduct in the United States by the defendants in her hypothetical. In our case, there is significant domestic infringing conduct in the record that Your Honors have already recognized in the last opinion that that is what led to the sales in Europe. So it's a different situation. It's different, but it's actually much better than for you. Your situation is better than Justice Jackson's hypothetical, right? It sounds like you're trying to argue away from her hypothetical that because it's more favorable to you than your own situation seemed like you would be grasping up with both arms. So Your Honor, I think that they're different because her hypothetical only focuses on resale within the United States and you are correct. Her hypothetical is more favorable because we don't have to show domestic infringing uses under her hypothetical that the infringement that occurred in Europe by selling the product initially sort of got reinvigorated in the United States and you don't have to show any additional domestic infringing uses. Well, what I'm talking about when I say more favorable is it was known here that these remote controls were going to go into products that were going to come to the United States, unlike the purses which got here randomly. Correct, and I agree that that is the more favorable aspect. What I'm suggesting is her hypothetical covers one element of those damages that we think need to be disgorged in this case. There's also all the other sales that were made abroad that were attributable to the domestic infringing conduct conducted by the defendants in the United States, which would cover a whole other swap of products, whether they came back into the United States or not. Maybe I can ask it this way. When Justice Jackson says at the end of her concurrence that she joins the Justice Alito opinion in full, then that's that. That's five votes for Justice Alito's and so that's what we operate on. We don't try to determine whether or not there are five justices that match up on some other point. Yes, Your Honor, and our situation is a super easy application of Justice Jackson's hypothetical. Let me ask it this way then. Does Justice Jackson's opinion even matter as far as what we're doing? I think it's instructive. We believe that we're making sales regardless of Justice Jackson's opinion, but certainly we fit squarely in her hypothetical for a good portion of those sales. Is her hypothetical important? I'm sorry, I didn't hear you, Your Honor. Well, I've been talking about a 4-4-1 split with her saying she joined the first four in full, and now you're talking about the hypothetical, but do we care about it? How does Justice Jackson's opinion affect your argument? Are you saying because Justice Jackson said this, that changes the result in some fashion, or is it just interesting reading for the next time another case comes along? So, Your Honor, we believe that under the majority's standard of domestic infringing uses that we're entitled to the within her hypothetical. Some of the sales, you don't need it for the disgorgement that we're seeking. We believe that the record is already replete with examples of defendants' domestic infringing uses that led to sales abroad. Defendants ironically want to focus where the sales took place, but that's not the domestic infringing uses that we're looking at. The sale is not the use. It's the other things that I've already mentioned. But how do you translate those other things into dollars of infringement? That suggests that you're entitled to the same amount on foreign sales that you got in the original trial, and that doesn't seem right to me. So, Your Honor, I don't think it's the exact same amount. So, I think that domestic infringing uses would be included. But, for example, if they make a sale... How do I measure that? You're not telling me how I measure that. Well, so, Your Honor, we'll put the evidence into Judge Friant to show all of the sales that were made to original equipment manufacturers who sell into the United States. We believe that all of those sales are attributable to domestic infringing conduct. But there are other sales that will not be attributable to domestic infringing conduct. But just because they sold to an original equipment manufacturer doesn't mean... Well, certainly not all of those ended up in the United States. A lot of them ended up in Belgium and Czechoslovakia, places like that. That's correct, Your Honor. But those sales are attributable to the domestic infringing conduct that took place in the United States. If those original equipment manufacturers didn't know that their products could be resold in the United States, they would have not bought any of those radio remote controls. Because as the evidence shows, these radio remote controls are used all over. They're swapped in, swapped out, including by the original equipment manufacturers. So, we believe those squarely fit within the Supreme Court's opinion. That means you have evidence in this record that foreign purchasers of these devices said, I would not have bought any from this defendant if I knew they could not be distributed in the United States, even though I have distribution all over the world. Is that what you're saying? There is evidence to that effect? So, Your Honor, we have evidence showing that where products can be used, including in the United States, is an important factor in the decision making. And again, for disgorgement, we don't have to show it's the only or even the main. We have to show there's a reasonable connection and that there is evidence in the record as to what OEMs think about when they choose which product they're going to buy. Would you at least concede that merely because there's evidence doesn't resolve this on remand, that it would actually take a finding that that evidence establishes that generally foreign OEMs would not buy any product from the defendant if they knew they could not distribute in the United States? Wouldn't that require a new finding? So, Your Honor, I don't think so. And the way that the disgorgement remedy works is we would put in evidence to Judge Friant to show that there's a plausible connection between the domestic infringing uses and the sales that we seek to disgorge. That's what our burden is under the law and under the case law and how these cases play out. And then the burden shifts to the defendants to say, no, no. And it doesn't have to be the only reason or the predominant reason. It has to be a reasonable, plausible connection. Then they can say, then if the burden shifts to defendants, say there's no conceivable connection. And then Judge Friant, in exercising his discretion as to what is fair, will do what will take to hear the different evidence and he'll decide what amount of those sales is appropriate to be disgorged, what's fair, and what will meet the requirements for deterrence and to prevent the defendants from being unjustly enriched. Are there other questions? Not here. All right. Thank you, counsel. One of the luxuries of having one case to be argued is we can go a little bit over time. And there we went eight minutes over time. Mr. Walker, we're not going to hold you to the small amount that you had left for rebuttal so long as you're rebutting and not raising new arguments. So please proceed. Thank you, Your Honor. I'll start with the idea that Steele was somehow reaffirmed or expanded and allows Lanham Act liability based on something other than a domestic use in commerce. I think that's inconsistent with the court's holding that the act applies only to cases where the accused infringing act use in commerce is domestic. I think the argument is that the domestic use in commerce is advertising an infringing product, for example, in the United States. So I think that is the argument today. I think in their supplemental brief, they argue that something other than domestic use in commerce is enough. And I think maybe they've now abandoned that. But with respect to, we don't dispute that theoretically, you could have a domestic use like that leads to some sort of foreign sale. But there really is not evidence that domestic advertising led to foreign sales in this situation. These are foreign companies selling to foreign companies. It's going to be foreign uses of the marks, if anything, that's leading to these sales. And what I mostly heard about what was happening in the United States that might have led to foreign sales was things like FCC certifications and having a U.S. distributor. But those are not using the protected mark in commerce in the United States. And FCC certification is just a license to use particular frequencies. And so that was necessary, even for the very small amount of U.S. sales that we did make. So I think that the attempt to sort of bootstrap a whole bunch of foreign sales by German and Austrian companies based on a website that was accessible in the United States or a U.S. distributor that might have sold 16,000 total euros worth of products in the United States is pretty far fetched. And there's nothing that a whole bunch of foreign sales. With respect to Justice Jackson's concurrence, I think I understood Judge Phillips correctly saying you can't really take that as the controlling opinion. It is not, you can't stitch together her opinion in the floor of dissenting or concurring justices with Justice Sotomayor because the four calling the dissent for dissenting votes would have not relied on the domestic use in commerce. They would have gone on domestic effects or a likelihood of confusion. And that is just a theory that's off the table now. Not the majority of the five justices held that a domestic use in commerce is required. So Justice Jackson was just giving an opinion as to what might then in the next case or the later stage of this case count as a domestic use in commerce. So when Justice Jackson says the court has no need to elaborate today on what it means to use a trademark in commerce, nor need to discuss how a meeting guides permissible domestic application, she's not saying you, Justice Alito, and others went beyond what you needed to say. She's saying you didn't discuss it all. You had no need to discuss it, but I'm going to tell you a few of my thoughts about that anyway. Is that your understanding? I think that's right. The majority opinion, its last footnote, says essentially the same thing. That's just not something we need to decide today. It's a later question. And for that, Justice Jackson spoke only for herself. And I think if you look closely at this question, a little bit more is needed than what Justice Jackson was talking about. I think you actually run into exactly the problems of international friction if you impose liability on a German handbag maker just because some student ends up reselling at a garage sale in the United States. I think that's the sort of thing the majority's opinion actually says is why we have the presumption against extraterritorial in the first place. And I think it's important to realize that use in commerce is a defined term in the Lanham Act and applies for a whole host of things, not just for infringement, but also for registration and maintenance of registered trademarks. That's section 1051 is where registration and use in commerce is required. And we showed in our supplemental brief that for a use in commerce to be considered attributable to a foreign seller, the mere fact that a third party has resold a product in the United States that it bought abroad is not a use by that foreign seller unless the resale in the United States is on behalf of the foreign seller. And that just didn't happen here. These OEMs were acting for themselves. They were not acting on our behalf. And I think that's the rule that should govern here. And it actually makes things very simple because then we're left with just the U.S. sales. And we know exactly what that number is. If you it's the plaintiff's burden to identify defendant sales, that's under sections 1117. Plaintiff's burden is to show our sales that are, as I said, attributable to domestic use of the mark in commerce. And they have not shown that it could be anything more than the 1.7 million in foreign sales that may have had a United States destination. It's just speculation and supposition for anything beyond that. And I think the Toypin example that Petronic has raised again is a good example of this because the testimony says that sales going back to 2003-2004, that's well before Petronic International even existed. And so there's nothing more than complete speculation. And that is not enough to justify reaching sales. I'd also note that in terms of equity and figuring out how because our expert was excluded in terms of showing what the costs were. And so if anything, that amount greatly overstates what our profits actually were. And going anything above those figures, I think, would end up being a penalty. But 1117 says it cannot be a penalty. It has to be compensation. And that 1.7 million, again, we don't think those foreign sales come in at all. But if they did, they would be definitely the ceiling in terms of what could be compensation for anything attributable to the United States use of the market and commerce. One small thing on treble damages, that actually applies to damages under 1117, something like their lost profits or out-of-pocket sales. We're talking about disgorgement of profits, of our profits. 1117 says that you can be increased or decreased if that disgorgement of profits is inadequate or excessive. And here we can't, I don't think it's possible to say that it's excessive. They got all of our revenues, not just our profits. I also think that Hedronic in its supplemental brief to this court, pages 17 to 18, has abandoned any request for additional relief. They specifically referred, they do not ask for any remand or an ability to reopen that request. Instead, they say that in figuring out what the disgorgement of our profits should be, it should take into account compensation they say they were entitled to seek but declined to pursue, such as attorney's fees and treble damages. And so I think that rules out the possibility of them being able to reopen that on remand. And I think that covers the things that I wanted to get you on rebuttal, but I'd certainly be happy to answer any additional questions. Any questions from the panel? Now, what is Hedronic to do then? Sue in Germany or Diend? Yes. So I think there's two options. So it claims to have marks in Germany. In fact, the Nova mark was recently held to be unregisterable by the European patent office. But yes, they could assert their European rights for any sales that we made in foreign countries. That's essentially what the Supreme Court said in terms of if you want protection in other territories, you get protection from those other territories and you assert your rights there. They could also, if they think that sales in the United States are infringing, then it actually presents evidence of actual resales that were happening in the United States that we can at most infer that maybe some happened. But if they could go after people who are reselling in the United States, anyone who's using that mark in a way that violates the act can be sued. And so that would be another way that they could get at it. There's also ways of preventing importation, which doesn't lead to civil action the way this does, but that's also another option. I believe that's section 1124 of the Lanham Act that allows for the importation ban. So they have a lot of other remedies that are out there, but here the fact is we are foreign companies that were mostly selling to other foreign companies. We tried to break into the U.S. market, but we're spectacularly unsuccessful at it. We sold 16,000 euros to some folks and most of the things that we sold in the United States were the heteronic itself. And so unless there are further questions, we'd ask that the All right. That ended almost with each of you receiving almost the same amount of time. So perfect. Although I see Judge Murphy's hand go up. Yeah, I was mooted, so I had to raise my hand. I don't understand, Mr. Walker, your argument of why Ms. Berman's argument against waiver forfeiture of treble damages and attorney's fees. I don't understand your argument why that's not a viable response to waiver or forfeiture. So I think with respect to any request by them for treble damages or attorney's fees, I think their supplemental brief, their latest submission to this court says we're not pursuing it. They didn't ask for that to be sent down to the district court. So I would view that as an abandonment of it. Oh, you say there's abandonment in this court? Yeah, it's pages 17 to 18 of their supplemental brief. What if we disagree with you? I was asking about abandonment in the district court. Why is Ms. Berman's argument wrong that there was not a waiver or forfeiture in the district court? Yeah, I think in that situation they did not pursue it. I mean, they haven't appealed the judgment themselves to seek additional relief beyond what they got. And I think at the end of the day, their submissions to this court are the clearest in terms of they're not pursuing that. I understand. All right. Thank you, counsel, for your arguments.